65,555-10

Dr. Alex Melvin Wade, Jr.
Paralegal Specialist
Mark W. Stiles
3060 FM 3514
Beaumont, Texas 77705-7638

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 1 4 2015

Abel Acosta, Clerk

# IN THE COURT OF CRIMINAL APPEALS

## OF TEXAS

### NO. WR-65,555-20

### IN RE: ALEX MELVIN WADE, JR., Relator

=======================================================================

ON APPLICATION FOR A WRIT OF MANDAMUS
CAUSE NO. 1222385-D IN THE 185TH DISTRICT COURT
FROM HARRIS COUNTY

=======================================================================

TO THE HONORABLE JUSTICE OF SAID COURT:

APPLICANT'S RESPONSE TO COURT'S ORDER OF NOVEMBER 4TH, 2015

MAY IT PLEASE THE COURT:

This Honorable Court issued its Order in the above entitled captioned cause on November 4th, 2015. It is clear the Order commanded two(2) circumstances be made clear, submit proof of the date of receipt by the State showing 180 days has not yet eslasped, or stating that Relator has not filed an application for writ of habeas corpus in Harris County.

The State of Texas, Harris County, Texas District Attorney on November 5th, 2015 answered this Court questions in its State's Original Answer and its Proposed Findings of fact, and conclusions of Law and Order transmitted to this Court from the Office of Chris Daniel, Clerk, Harris County, Texas transmitted on November 11th, 2015. State's filing makes clear this Relator/Applicant filed on February 24th, 2014 the original writ of habeas corpus and on March 26th, 2015 Relator/Applicant filed an amended writ of habeas corpus. The State acknowledge

receipt of the writ of habeas corpus received on February 24th, 2014 and the amended writ of habeas corpus on March 26th, 2014. That in mind, it is clear the 180 days has elasped since receipt of the writ of habeas corpus by the State through the Office of Devon Anderson, District Attorney, 1201 Franklin Statee, 6th Fl., Houston, Texas 77002.

However, the State's proposed finding of fact, and Conclusion of Law & Order has caused the record, the habeas corpus record be incomplete when forwarded to this Court.

State has caused to be deleted from the record, its Motion Designating Issues filed on March 11th, 2014, submitted by Andrew Smith, Assistant District Attorney and the Proposed Order Designating Issue signed the Honorable Susan Brown, Presiding in the 185th District Court, Harris County, Texas. State's Motion Requesting Designation of Issue as follows:

1. Whether the applicant is actually innocent in the primary case;

Before continuing, the Honorable Meyer, Judge writing for this Court in Ex parte Elizondo, 947 S.W.2d 202, stated we accept the proposition that the "execution of an innocent person would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution" and announced that this Court would entertain postconviction applications for writ of habeas corpus alleging actual innocent as an independent ground for relief. Applicant has brought before the 185th District Court, Harris County, Texas this type application.

2. Whether the applicant received ineffective assistance of counsel in the primary case;

The applicant writ of habeas corpus raises the substantive claim that is

-2-

presented is differ in at least two important ways from the claim presented in Herrera v. Collins, 506 U.S. 390, 398(1993). First, Schlup v. Delo, 513 U.S. 298(1995) claim of innocence does not by itself provide a basis for relief. In stead, as indicated by the State's Motion Requesting Designation of Issue , the claims of applicant depends critically on the validity of his Strickland v. Washington, and Brady v. Maryland, 373 U.S. 83(1963) claims. Schlup's claim of innocence is thus "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits," at 208. The State's proposed Finding of Fact, and Conclusions of Law and Order have manipulated the habeas corpus record to avoid Applicant review by this Court of the claims and evidence presented between the 19 months this matter has been pending before the 185th District Court, Harris County, Texas.

3. Whether the evidence was insufficient to convict the applicant in the primary case;

This Applicant is being deprived of an evidentiary hearing to show the evidence, show him to be innocent of the crime of attempted theft.

Applicant has presented the Clerk's Record, 00004 showing the State used an invalid complaint to indict Applicant. Applicant presented in pleadings presented to the lower Court evidence, supporting his actual innocence claim and that there is no "complainant" as alleged in the indictment. CR-00002, see Applicant evidence, testimony of State's Chief Witness, Eitan Price, (CR-00328 Lns. 13-24) Where the the Applicant's trial attorney failed to seek dismissal of the charge brought by indictment because the State failed to meet it burden.

-3-

The state contend in the indictment (CR-00002) the complainant to be Western World Insurance Group, that did not happen. However, Applicant's trial Attorney Lawrence Cerf, attempted to lead the witness to say that it did file a complaint against Defendant but the same back fired. Counsel's failure to move to dismiss the indictment and seek a directed verdict of not guilty is ineffective assistance of counsel and violates Defendant's Sixth Amendment to effective assistance of counsel.

4. Whether the State committed a Brady violation in the primary case;

In light of Ex parte Richardson, 70 S.W.3d 865(Tex.Crim.App. 2002), the Opinion issued by the Honorable Cochan, Judge, that Court said, to prevail upon a post-conviction writ of habeas corpus, applicant bears the burden of providing by a preponderence of the evidence, the facts that would entitled him to relief. Applicant's habeas record manipulated to cause evidence presented to the lower court not reviewed by this court, is nothing less than a blanant violation of due process.

Applicant presented in the habeas corpus record in the lower court, the state had an affirmative duty under Brady v. Maryland, to disclose material evidence that would have impeached the testimony of Michael Coulter, Capital One, N.A.,'S Bank manager, the actual copy of the deposit slip issued by the Capital One, N.A., Bank manager, Michael Coulter and a copy of the contract entered between Capital One. N.A.,'s Bank manager, Michael Coulter, showing that the testmony provided to the jury was in fact prejuried testimony. The Applicant Exhibit's Presented to the lower court, Exhibit "Z," "Z-1," & "Z-2" Z-1 showing a deposted was credited to the account operated by Applicant.

-4-

5. Whether the State allowed perjuried evidence and false testimony in the primary case.

Judge Meyer, went on to write, "In Holmes, we held that in order to be entoitled to relief on a claim of actual innocence the applicant must show that based on newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt, beyond reasonable doubt." 885 S.W. 2d at 398.

Judge Cochan, writing in Ex parte Richardson, ft. note 22, "A habeas applicant demonstrates that he is entiled to relief for Brady violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. at 435; Ex parte Adams, 768 S.W.2d 290. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.

In White, Judge's dissenting opinion, he writes Based on these considerations, an applicant seeking relief based on a claim of innocence should have to "demonstrate that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict and that it is probable that the verdict sufficient to undermine confidence in the verdict would be different." State ex rel. Holmes, 885 S.W.2d at 398. If this showing is made, the habeas court must give the applicant a forum and the opportunity to present evidence. Ibid. Because the District court held a hearing on Applicant's claim of innocence, it needs only to be determined what burden of proof applicant must satisfy to obtain relief. Id. at 213

-5-

Applicant/Relator Alex Melvin Wade, Jr., submitted newly discovered evidence and relevant evidence of his actual innocence. Further, Alex Melvin Wade, Jr., directed the Court to the Clerk's Record CR-00004, the invalid complaint used by the State to indictment Applicant for the offense of attempted theft. The complaint is clear, the complainant in that complaint 1116862, is Josephine Credena of San Jacinto Area Credit Union, that indictment was dismissed against Applicant when reindicted in this cause of action. The indictment in this cause CR-00002, is clear it is Western World Insurance Company that filed the complaint, Eitan Price, provided testimony under cross examination that Western World Insurance Company did not file a complaint. State's Chief Witness Eitan Price's testimony is consistent with the record, there is no complainant. See, CR-00328 Lns. 13-24

Applicant/Relator Alex Melvin Wade, Jr., deprived of an "evidentiary hearing," allowing him the opportunity to show his actual innocence claim will deny Applicant/Relator his due process of law. In light of Ex parte Elizondo, 947 S.W.2d 202, 217(Tex.Crim.App. 1996)(En Banc) and Ex Parte Richardson, 70 S.W.3d 865(Tex.Crim.App. 2002), Applicant/Relator is entitled to an evidentiary hearing, respectively.

CONCLUSION09

For the foregoing reasons, Applicant/Relator Alex Melvin Wade, Jr., prays this Honorable Court issue mandamus compelling the lower Court issue an order commanding, response to the designated issue, evidentiary hearing and findings of fact, and conclusion of law be held within 180 days for issuance of the mandamus.

Respectfully submitted,

Dr. Alex Melvin Wade, Jr.
Paralegal
Mark W. Stiles

3036  FM 3514
Beaumont, Texas 77705-7638

CERTIFICATE OF SERVICE

I, Dr. Alex Melvin Wade, Jr., pro se, herein hereby certify a true and correct copy of the foregoing instrument has this ___ day of December 2015 been served upon the Office of Chris Daniel, Clerk, Harris County, Texas 1201 Franklin Street, 3rd Fl., Houston, Texas and unpon the Office of Devon Anderson, Dis trict Attorney, Harris County, Texas 1201 Franklin Street, 6th Fl., Houston, Texas 77002 postage prepaid.

Dr. Alex Melvin Wade, Jr.
Attorney of Record

-7-

The UNIVERSITY OF TEXAS AT DALLAS, Petitioner,

v.

Abraham Nee NTREH, Respondent.

No. 96-1316.

Supreme Court of Texas.

June 20, 1997.

Former employee brought action against state university, alleging, breach of contract, race discrimination, and violations of § 1983. The 192nd Judicial District Court, Dallas County, Merrill Hartman, J., dismissed action on ground that university was immune from suit. Employee appealed. The Dallas Court of Appeals, 936 S.W.2d 649, Wright, J., held that university was immune from suit on § 1983 claim but not on breach of contract and state discrimination claims. University applied for writ of error. The Supreme Court held that state university was immune from breach of employment contract action by former employee.

Application granted; Court of Appeals' judgment modified.

Colleges and Universities ⚫5

State university was immune from breach of employment contract action by former employee.

James B. Pinson, Dan Morales, Austin, for Petitioner.

Shawn M. Frazin, Alan B. Rich, Dallas, for Respondent.

PER CURIAM.

Abraham Ntreh, an undergraduate at the University of Texas at Dallas, was found guilty of plagiarism in a University disciplinary proceeding and expelled. Ntreh sued the University for breach of contract and for discrimination (Ntreh is a Ghanan national) in violation of state and federal statutes.

The district court dismissed the suit on the grounds that the University, a state agency, was immune from suit on all Ntreh's claims. The court of appeals held that the University is immune from suit on his federal statutory claim but not on his breach of contract and state statutory claims. 936 S.W.2d 649.

The University appeals only from the remand of Ntreh's contract claim. The University's assertion of immunity is supported by our decision today in *Federal Sign v. Texas Southern University,* —— S.W.2d —— (Tex.1997). For the same reasons explained there, without hearing oral argument, we grant the University's application for writ of error and modify the court of appeals' judgment to affirm dismissal of Ntreh's claim for breach of contract. Tex.R.App.P. 170.



---

Ex parte Joe Rene ELIZONDO, Applicant.

No. 72235.

Court of Criminal Appeals of Texas, En Banc.

Dec. 18, 1996.

Dissenting Opinion on Denial of Rehearing of Judge Womack June 18, 1997.

Defendant was convicted in the Criminal District Court, Jefferson County, Larry Gist, J., of aggravated sexual assault of his stepson, and he appealed. The Court of Appeals, 697 S.W.2d 65, affirmed. Subsequently, defendant petitioned for habeas corpus relief on ground of newly discovered evidence. The Court of Criminal Appeals, Meyers, J., held that: (1) overruling *Ex parte Binder,* 660 S.W.2d 103 and *Ex parte May,* 717 S.W.2d 84, due process clause of Federal Constitution forbids incarceration, as well as execution, of innocent person; (2) in reviewing habeas claim of actual innocence based on newly discovered evidence, job of Court of

Criminal Appeals is to decide whether newly discovered evidence would have convinced jury of applicant's innocence; (3) in such cases, applicant must show that new facts unquestionably establish applicant's innocence; and (4) stepson's recantation warranted habeas relief.

Ordered accordingly.

Baird, J., filed concurring opinion.

White, J., filed dissenting opinion in which McCormick, P.J., and Keller, J., joined.

Mansfield, J., dissented.

Womack, J., filed dissenting opinion on denial of rehearing, in which McCormick, P.J., and Keller and Holland, JJ., joined.

1. Constitutional Law ⚫272(1, 2)
Habeas Corpus ⚫462
Due process clause of Federal Constitution forbids not just execution, but also claims of actual innocence are cognizable by Court of Criminal Appeals in postconviction habeas corpus proceedings whether punishment assessed is death or confinement; in either case, such claims raise issues of federal constitutional magnitude; overruling *Ex parte Binder,* 660 S.W.2d 103 and *Ex parte May,* 717 S.W.2d 84. U.S.C.A. Const.Amend. 14.

2. Criminal Law ⚫1144.13(2.1), 1159.2(9), 1159.4(1)
When Court of Criminal Appeals conducts legal sufficiency-of-evidence review, it does not weigh evidence tending to establish guilt against evidence tending to establish innocence, nor does it assess credibility of witnesses on each side but, rather, it views evidence in manner favorable to verdict of guilty.

3. Criminal Law ⚫1144.13(6)
When conducting legal sufficiency-of-evidence review, Court of Criminal Appeals, in practice, assumes that jury weighed lightly exculpatory evidence and disbelieved entirely exculpatory witnesses, and court makes that assumption no matter how powerful exculpatory evidence may seem or how credible defense witnesses may appear; if inculpatory

4. Criminal Law ⚫1159.2(9)
One of most significant differences between "factual" and "legal" or "constitutional" sufficiency of evidence standards is that the latter does not permit weighing of inculpatory against exculpatory evidence.

5. Habeas Corpus ⚫494
Court of Criminal Appeals must necessarily weigh exculpatory evidence against evidence of guilt adduced at trial when evaluating habeas claim that newly discovered or available evidence proves applicant to be innocent of crime for which he was convicted, as court's task in evaluating such claim is to assess probable impact of newly available evidence upon persuasiveness of state's case as whole.

6. Habeas Corpus ⚫462, 494
Person finally convicted in fair trial is not permitted to wage collateral attack on that conviction without making exceedingly persuasive case that he is actually innocent and, thus, applicant for habeas relief based on claim of actual innocence must demonstrate that newly discovered evidence, if true, creates doubt as to efficacy of verdict sufficient to undermine confidence in verdict and that it is probable that verdict would be different on retrial.

7. Habeas Corpus ⚫494
In order for confidence in verdict to be undermined by newly discovered evidence, it is not to review jury's verdict, but to decide whether newly discovered evidence would have convinced jury of applicant's innocence.

8. Habeas Corpus ⚫494
Job of Court of Criminal Appeals, in exercise of its postconviction habeas jurisdiction, is not to review jury's verdict, but to decide whether newly discovered evidence would have convinced jury of applicant's innocence. Vernon's Ann.Texas C.C.P. arts. 11.07, 11.071.

STILES LAW LIBRARY
AUG/26/2013
1/8

9. Habeas Corpus ⊗494

In order to grant habeas relief on claim that newly discovered evidence would have entitled applicant to new trial of aggravated sexual assault, court must be convinced that new facts "unquestionably establish" applicant's innocence; "unquestionably establish" means to establish by "clear and convincing" evidence.

See publication Words and Phrases for other judicial constructions and definitions.

10. Habeas Corpus ⊗494

Defendant convicted of aggravated sexual assault based solely upon testimony of his stepson, who was one of alleged victims, was entitled to habeas relief based on stepson's recantation; both stepson and his younger brother, who were currently grown men, claimed that testimony given by stepson at trial was false, and that their natural father had relentlessly manipulated and threatened them into making such allegations against defendant in order to retaliate against their natural mother for marrying defendant, and record supported finding that recantation was more credible than trial testimony. U.S.C.A. Const.Amend. 14.

Douglas Barlow, Beaumont, for appellant.

Paul McWilliams, Rodney Conerly, Asst. Dist. Attys., Beaumont, Charles M. Mallin, Asst. Dist. Atty., Fort Worth, Matthew Paul, State's Atty., Austin, for State.

Before the court en banc.

OPINION

MEYERS, Judge.

In State ex rel. Holmes v. Court of Appeals, 885 S.W.2d 389, 397 (Tex.Crim.App. 1994), we accepted the proposition that the "execution of an innocent person would violate the Due Process Clause of the United States Constitution" and announced that this Court would begin to entertain postconviction applications for the writ of habeas corpus alleging actual innocence as an independent ground for relief. The instant cause comes to us on one such application.

In 1984, applicant was convicted in a jury trial of aggravated sexual assault. His punishment was assessed at confinement in the penitentiary for life and a fine of $10,000.00. The Ninth Court of Appeals affirmed. Elizondo v. State, 697 S.W.2d 65 (Tex.App.—Beaumont 1985, PDR ref'd). But last year, the witness whose testimony was mainly responsible for convicting applicant recanted. As a result, applicant has filed the instant petition alleging that newly available evidence shows him to be innocent of the crime for which he was convicted.

I.

[1] At the threshold, we must decide whether the Due Process Clause of the United States Constitution forbids, not just the execution, but the incarceration as well of an innocent person. We need not pause long to answer this question. Although it is sometimes said that Due Process requires an especially high level of reliability in the mechanisms leading to a death sentence, Beck v. Alabama, 447 U.S. 625, 637-38, 100 S.Ct. 2382, 2389-90, 65 L.Ed.2d 392 (1980), it is reasonably clear that the basis for entertaining postconviction habeas claims of actual innocence is not peculiar to capital cases. As the Supreme Court observed in Herrera v. Collins, upon which we based our holding in Holmes:

Petitioner asserts that the Eighth and Fourteenth Amendments to the United States Constitution prohibit the execution of a person who is innocent of the crime for which he was convicted. This proposition has an elemental appeal, as would the similar proposition that the Constitution prohibits the imprisonment of one who is innocent of the crime for which he was convicted. After all, the central purpose of any system of criminal justice is to convict the guilty and free the innocent.

506 U.S. 390, 398, 113 S.Ct. 853, 859, 122 L.Ed.2d 203, 215 (1993). Thus Herrera's claim that a more exacting standard should be applied in his case because he was convicted under a sentence of death was expressly rejected by the Court.

Petitioner asserts that this case is different because he has been sentenced to

death.... [But] petitioner's claim is not ...

Herrera, 506 U.S. at 405, 113 S.Ct. at 863.

These remarks represent the views of at least five justices, including Justice O'Connor who, although she filed a concurring opinion in which she was joined by Justice Kennedy, also joined the opinion of the Court. Likewise, the dissenters seem to recognize no significant difference between cases in which the death penalty has been assessed and cases in which an actually innocent person has been merely incarcerated.

Whether petitioner is viewed as challenging simply his death sentence or also his continued detention, he still is challenging the State's right to punish him.... [The legitimacy of punishment is inextricably entwined with guilt.]

Herrera, 506 U.S. at 433-34, 113 S.Ct. at 878, 122 L.Ed.2d at 238 (Blackmun, J., dissenting).

We think it clear from these excerpts that the incarceration of an innocent person is as much a violation of the Due Process Clause as is the execution of such a person.] It follows that claims of actual innocence are cognizable by this Court in a postconviction habeas corpus proceeding whether the punishment assessed is death or confinement. In either case, such claims raise issues of federal constitutional magnitude. Ex parte Brave, 702 S.W.2d 189, 193 (Tex.Crim.App.1982)(habeas corpus will lie to review jurisdictional and constitutional defects in a judgment of conviction). To the extent that Ex parte Binder, 660 S.W.2d 103 (Tex.Crim.App.1983) and Ex parte May, 717 S.W.2d 84 (Tex.Crim.App.1986) are to the contrary, we expressly overrule them.

II.

In Holmes, we held that "in order to be entitled to relief on a claim of factual innocence the applicant must show that based on the newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt beyond reasonable doubt." 885 S.W.2d at 398. However, no application of the standard was actually made in that case because no petition for the writ of habeas corpus was pending before this Court at that time. In the present context, therefore, a more complete explanation of this Court's role and of the criteria we use to assess the merits of an actual innocence claim is indicated.

At the outset, we perceive an anomaly in our Holmes opinion, which describes the ultimate criterion for relief under the actual innocence test as if our task were to decide whether the evidence of guilt could support a conviction in light of the newly discovered evidence of innocence. Such characterization is misleading because, if habeas corpus relief is to be conditioned upon a finding that no rational juror could convict, the applicant after introduction of the newly discovered evidence, it becomes theoretically impossible for any habeas applicant to sustain his burden because exculpatory evidence can never outweigh inculpatory evidence under this standard of sufficiency. See Holmes, 885 S.W.2d at 417-18 (Clinton, J., dissenting).

[2, 3] When we conduct a legal sufficiency-of-the-evidence review as prescribed by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we do not weigh the evidence tending to establish guilt against the evidence tending to establish innocence. Nor do we assess the credibility of witnesses on each side. We view the evidence in a manner favorable to the verdict of guilty. In practice, this means we assume that the jury weighed lightly the exculpatory evidence and disbelieved entirely the exculpatory witnesses. We make this assumption no matter how powerful the exculpatory evidence may seem to us or how credible the defense witnesses may appear. If the inculpatory evidence standing alone is enough for rational people to believe in the guilt of the

defendant, we simply do not care how much credible evidence is on the other side.[1]

[4] Of course, we have lately come to hold that the courts of appeals do have authority to conduct factual sufficiency reviews on direct appeal, and we have indicated that we also have such authority, in capital cases in which exculpatory evidence may be weighed against inculpatory evidence. *Clewis v. State,* 922 S.W.2d 126, 130 & 136 (Tex.Crim.App.1996). But this kind of evidentiary review is quite different from that in which the evidence is examined to determine whether, viewing it in a light most favorable to the verdict, any rational trier of fact could have found the defendant guilty beyond reasonable doubt. Indeed, one of the most significant differences between the so-called "factual" and the so-called "legal" or "constitutional" sufficiency-of-the-evidence standards is that the latter does not permit a weighing of inculpatory against exculpatory evidence.

[5] Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily "weigh" such exculpatory evidence against the evidence of guilt adduced at trial. The *Jackson v. Virginia* standard of evidentiary sufficiency is simply not appropriate to this purpose.

1. The Supreme Court has recently stated that *Jackson* is not appropriate for assessing claims of actual innocence based on new evidence and coupled with a claim of constitutional error at trial. In *Schlup v. Delo,* 513 U.S. 298, 330-31, 115 S.Ct. 851, 868-69, 130 L.Ed.2d 808, 838 (1995), the Court differentiated between the *Jackson* standard and the standard set forth in *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), which governs the miscarriage of justice inquiry applicable to a petitioner who has been sentenced to death and raises actual innocence as an exception to a showing of cause and prejudice in a successive writ. Under *Carrier,* a petitioner must show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' *Schlup,* 513 U.S. at 327, 115 S.Ct. at 867, 130 L.Ed.2d at 836. The Court explained:

Though the *Carrier* standard requires a substantial showing, it is by no means equivalent

to the *Jackson* standard.... First, under *Jackson,* the assessment of the credibility of the witnesses is, generally beyond the scope of review. In contrast, under the [*Carrier* standard] the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial.... [Further,] [u]nder *Jackson,* the question whether the trier of fact has power to make a finding of guilt requires a binary response; either the trier of fact has power as a matter of law or it does not.... Thus, though under *Jackson, the mere existence of sufficient evidence to convict would be determinative of petitioner's claim,* that is not true under *Carrier.*

*Schlup,* 513 U.S. at 330-31, 115 S.Ct. at 868-69, 130 L.Ed.2d at 838 (emphasis added). Justice O'Connor also expressed the view in a separate opinion that *Jackson* "would be ill-suited as a burden of proof." *Id.* at 333, 115 S.Ct. at 870, 130 L.Ed.2d at 840 (O'Connor, concurring).

[6, 7] Of course, any person who has once been finally convicted in a fair trial should not be permitted to wage, a collateral attack on that conviction without making an exceedingly persuasive case that he is actually innocent. It is thus entirely reasonable to insist, and we continue to insist, that an applicant for habeas relief based on a claim of actual innocence must "demonstrate that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different [on retrial]." *Holmes,* 885 S.W.2d at 398. But it is not reasonable to hold, and we reject the implication of *Holmes,* that confidence in a verdict is undermined only when newly discovered evidence renders the State's case legally or constitutionally insufficient for conviction.

In *Holmes,* we took this unusual expression of the standard directly from Justice Byron White's perfunctory concurring opinion in *Herrera v. Collins.* *Holmes,* 885 S.W.2d at 398-99. In that case, Herrera sought to reverse his death sentence because some witnesses came forward years later to implicate his brother. Most justices of the Supreme Court, including Justice White, refused to hold that Herrera's claim of actual innocence was independently cognizable in a federal habeas corpus proceeding. Indeed, they specifically declined to decide that question.

But the three justices who would have granted Herrera partial relief did address the question. Writing for these justices, Justice Blackmun argued:

The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is actually innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.

*Herrera,* 506 U.S. at 443, 113 S.Ct. at 883, 122 L.Ed.2d at 244 (Blackmun, J., dissenting) (citations omitted).

[8] On reflection, we now acknowledge that *Jackson* is not a suitable standard for

tion because the facts plainly showed Herrera to be guilty of the crime under any standard. The Court simply reasoned that, even if it were unconstitutional to execute an innocent person, it would not be unconstitutional to execute Herrera since he was not innocent.

In subscribing to this view, Justice White, writing only for himself and without elaboration, surmised that a habeas petitioner, even under the most generous standard, would at least be required to show that no rational juror could have convicted him in light of the newly discovered evidence. Clearly, what Justice White meant by this is that, to sustain a claim of actual innocence, a habeas petitioner should, at a minimum, be able to persuade the court that the new evidence raises a reasonable doubt about his guilt. According to Justice White, Herrera had not even approached this minimum level of persuasion, so it was not necessary to consider what further level of persuasion would have been required for him to prevail on the merits.

*Id.* This is a far more fitting approach to the resolution of factual issues, focusing on the burden and quantum of proof required for an affirmative finding in the first instance rather than on the standard associated with a deferential review of that finding. Accordingly, we now hold that, in the exercise of our postconviction habeas jurisdiction under article 11.07 and 11.071 of the Code of Criminal Procedure, our job is not to review the jury's verdict but to decide whether the newly discovered evidence would have convinced the jury of applicant's innocence.

[9] The further question is, what level of confidence must the habeas court have in concluding that the applicant has met his burden. Justice Blackmun and those who joined him in *Herrera* suggested that "to obtain relief on a claim of actual innocence, the petitioner must show that he is probably innocent." But the Supreme Court has since indicated that a higher standard is applicable to *Herrera*-type claims:

describing the applicant's burden of proof in a collateral proceeding where he does not attack the rationality of a factfinder's verdict. *See* fn 1, *supra.* On the other hand, Justice Blackmun's formulation, because it focuses on the applicant's burden of proof, directs the habeas court, as factfinder, to weigh the newly discovered, exculpatory evidence against the inculpatory evidence offered at trial for the purpose of determining whether it affirmatively shows the applicant to be innocent. Thus, Justice Blackmun continues:

Because placing the burden on the petitioner to prove innocence creates a presumption that the conviction is valid, it is not necessary or appropriate to make further presumptions about the reliability of newly discovered evidence generally. Rather, the court charged with deciding such a claim should make a case-by-case determination about the reliability of the newly discovered evidence under the circumstances. The court then should weigh the evidence in favor of the prisoner against the evidence of his guilt. Obviously, the stronger the evidence of the prisoner's guilt, the more persuasive the newly discovered evidence must be.

In *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the petitioner raised a claim of actual innocence in an effort to bring himself within the "narrow class of cases" implicating fundamental miscarriage of justice as an exception to a showing of cause and prejudice for failure to raise the claim in an earlier writ. The Court took pains to distinguish between Schlup's claim and the claim presented by the petitioner in *Herrera*. Schlup's claim of innocence did not alone provide a basis for relief, but was tied to a showing of constitutional error at trial.

Herrera's claim of actual innocence had nothing to do with the proceedings leading to his conviction; he simply claimed that execution of an innocent man would violate the Eighth Amendment. The Court expounded upon the differences between the two situations, emphasizing the greater burden that must be borne in order to prevail in a naked claim of actual innocence:

Schlup's claim thus differs in at least two important ways from that presented in *Herrera*. First, Schlup's claim of innocence does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his *Strickland* and *Brady* claims. Schlup's claim of innocence is thus, "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404, 113 S.Ct. 853 [at 862], 122 L.Ed.2d 203; *see also* [*Schlup v. Delo*,] 11 F.3d [738], at 740 [8th Cir. 1993].

More importantly, a court's assumptions about the validity of the proceedings that resulted in conviction are fundamentally different in Schlup's case than in Herrera's. In *Herrera*, petitioner's claim was evaluated on the assumption that the trial that resulted in his conviction had been error-free. In such a case, when a petitioner has been "tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants," 506 U.S., at [419], 113 S.Ct. 853 [at 870], 122 L.Ed.2d 203, it is appropriate to apply an "extraordinarily high" standard of review. *Id.*, at [426], 113 S.Ct. 853

.... If there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish Schlup's innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that 'that trial was untainted by constitutional error,' Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claims.

[at 874], 122 L.Ed.2d 203 (O'Connor, J., concurring).

Schlup, in contrast, accompanies his claim of innocence with an assertion of constitutional error at trial. For that reason, Schlup's conviction may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial. Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error, the petitioner may pass through the gateway and argue the merits of his underlying claims.

Consequently, Schlup's evidence of innocence need carry less of a burden. In *Herrera* (on the assumption that petitioner's claim was, in principle, legally well-founded) the evidence of innocence would have had to be strong enough to make his execution "constitutionally intolerable" even if his conviction was the product of a fair trial. For Schlup, the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial.

*Schlup*, 513 U.S. at 315–17, 115 S.Ct. at 861–62, 130 L.Ed.2d at 828–29 (footnotes omitted). This discussion makes clear that an exceedingly high standard applies to the assessment of claims of actual innocence that are not accompanied by a claim of constitutional error at trial. Where the trial has been constitutionally error-free, a conviction is entitled to the greatest respect. The habeas court must be convinced that the "new facts unquestionably establish [the applicant's] innocence." *Id.*

Accordingly, we adhere to the views of the Supreme Court, as expressed in *Schlup*, that in the case of a *Herrera*-type claim, the habeas court must be "convinced that [the] new facts unquestionably establish [the applicant's] innocence." *Schlup* did not elaborate, however, as to the level of confidence invoked by use of the phrase "unquestionably establish." But we know that it is a higher level of confidence than "more likely than not," since that is the standard applicable to *Schlup*-type claims. (In the context of a *Schlup*-type claim, the Supreme Court explained that a "petitioner must show that the constitutional error 'probably resulted in the conviction of one who was actually innocent.'" *Id.* at 322, 115 S.Ct. at 864, 130 L.Ed.2d at 883 (setting forth *Carrier* standard, which was later held applicable to *Schlup* type claims). The Court further articulated the "probably resulted" standard as follows:

The petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.

*Id.* at 327, 115 S.Ct. at 867, 130 L.Ed.2d at 836. The "probably resulted" and "more likely than not" language was interpreted to mean essentially the same thing. The question is, in the *Herrera*-type situation presented here, what level of confidence is required to implement the "unquestionably establish" language. We know from *Schlup* that it must be an "extraordinarily high" standard. *Id.* at 315–16, 115 S.Ct. at 861, 130 L.Ed.2d at 828. We hold that in the case of a *Herrera*-type claim of actual innocence, the petitioner must show *by clear and convincing evidence* that no reasonable ju-[ror would have convicted him in light of] the new evidence.

In other words, we interpret the "unquestionably establish" language to mean the same thing as "clear and convincing."

It is important to remember that applicant's habeas petition in this case is not an attack on the jury's verdict. Nowhere does applicant claim that the verdict is invalid or should be invalidated. [What he wants is a new trial based on newly discovered evidence which he claims proves his innocence. We have held that such a claim is cognizable in habeas corpus because punishment of an innocent person violates the Due Process Clause of the United States Constitution. *Holmes*, 885 S.W.2d 389.] Consequently, if applicant can prove by clear and convincing evidence to this Court, in the exercise of its habeas corpus jurisdiction, that a jury would acquit him based on his newly discovered evidence, he is entitled to relief. We turn now to a consideration of the proof adduced for that purpose by applicant in the instant cause.

III.

[10] Applicant's conviction for aggravated sexual assault, the validity of which is here challenged, was based solely upon the testimony of his step-son Robert, one of the alleged victims in that case. This inculpatory testimony was given in court both by the victim himself and by the hearsay report of his step-mother and of a police officer who was dispatched to investigate the complaint made by his step-mother. A sexually explicit picture drawn by Robert at school and a sexually suggestive note written by him to one of his female classmates were also received in evidence because it was the seizure of these items by the child's teacher during class that precipitated the subsequent interrogation of Robert by his father and the police, leading eventually to the criminal prosecution of applicant for aggravated sexual assault. However, neither the drawing nor the note actually intimated that the child had been sexually abused or assaulted, either by applicant or by any other person. No other incriminating evidence was offered or received at trial.

4 / 8

STILES

Robert's testimony was, as might be expected, perfunctory. But it did clearly state that Robert and his younger brother were both made to view sexually explicit video-tapes by their natural mother and by applicant, her husband. The children were also, according to the testimony adduced at trial, made to perform fellatio on applicant, to have oral sexual contact with their mother's breasts, and to have anal intercourse both with their mother and with applicant. They were ten and eight years old, respectively, at the time these events allegedly occurred.

It is now more than thirteen years later, and the children are grown men. Both now claim that the testimony given by Robert at trial was false. They say that their natural father relentlessly manipulated and threatened them into making such allegations against applicant in order to retaliate against their natural mother, his ex-wife, for marrying applicant years before. Of course, we cannot know beyond all doubt whether this allegation is true. Their father, who is still alive and able to testify, denies it. But their claim is not implausible on its face, and particularly given the complete lack of any other inculpatory evidence in the case, direct or circumstantial, we think that another jury hearing the evidence, including the newly discovered mature recantation of Robert's juvenile testimony, would view the new evidence as the more credible and would acquit applicant. The habeas court, which had the opportunity to view the witnesses, concluded that Robert had testified falsely at trial. The record supports a finding that the recantation in this case is more credible than the trial testimony was. Robert's recantation not only voids his trial testimony which implicated applicant, but constitutes affirmative evidence of applicant's innocence. We are convinced by clear and convincing evidence that no rational jury would convict him in light of the new evidence. Accordingly, applicant is entitled to relief.

The Director of the Texas Department of Criminal Justice, Institutional Division is, therefore, ordered to return applicant to the custody of the county from which he was received so that he may answer the charges against him.

---

* WHITE, J., reserves the right to file a written opinion.

---

BAIRD, Judge, concurring.

In *State ex rel. Holmes v. Court of Appeals*, 885 S.W.2d 389 (Tex.Cr.App.1994), we held habeas corpus is an appropriate vehicle, in capital cases, to assert claims of factual innocence based on newly discovered evidence. *Id.* 885 S.W.2d at 398. Today, the majority extends our holding in *Holmes* to non-capital cases. Additionally, the majority alters the *Holmes* standard and adopts the standard announced by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Because the standard in *Holmes* was derived from *Herrera v. Collins*, 506 U.S. 390, 428-29, 113 S.Ct. 853, 875, 122 L.Ed.2d 203 (1993)(White, J., concurring), I have no problem, at this time, altering our standard to follow the Supreme Court's evolution of "actual innocence" jurisprudence. Consequently, I join the majority opinion.

---

• I write separately to explain why I believe applicant has shown "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Ante*, 947 S.W.2d at 209, is entitled to habeas relief.

---

McCORMICK, P.J., and WHITE,* MANSFIELD, and KELLER, JJ., dissent to this opinion.

## I.

### A. The Trial

Applicant was charged with the aggravated sexual assault of his ten-year-old stepson, Robert. At trial the State presented only four witnesses: Robert, his school teacher, his stepmother and a policeman. The testimony indicated that Robert's parents were divorced. Both later re-married and Robert lived with his father and stepmother. He visited his mother and applicant on alternating weekends. According to Robert, on these weekend visits his mother, applicant, Robert and his brother watched "dirty movies" and Robert and his brother engaged in oral sex with their mother and applicant. Robert testified that sometimes friends of his mother and applicant would participate. These matters were discovered after Rob-

ert's teacher obtained a sexually explicit note written by Robert as well as a sexually explicit drawing. Based on this testimony applicant was convicted of aggravated sexual assault and sentenced to confinement for life and fined $10,000.00.

### B. The Habeas Application

In his writ application, applicant contended Robert's testimony was false and that there exists newly discovered evidence of innocence. The application was supported by affidavits wherein Robert and his brother stated that neither their mother nor applicant ever sexually assaulted them. Rather, their natural father forced them to make the earlier charges against their mother and applicant through threats of physical violence. The brothers stated that Robert perjured himself at applicant's trial and that applicant is innocent.

### C. The Habeas Hearing

At the writ hearing, Robert and his brother testified they never engaged in sexual acts with their mother or applicant. When Robert's teacher discovered the drawing and note, she notified Robert's stepmother. After discussing the note and drawing with Robert, Robert's father notified the police and ordered both boys to state they had engaged in sexual acts with their mother and applicant. Robert's father threatened to spank the boys every day for the rest of their lives[1] if they did not make these statements. The boys were afraid of their father, who forced them to repeat their statements over and over into a tape recorder until he was satisfied. Robert's father was angry with his ex-wife and often promised to get back at her "one way or another."

The brothers testified they did not realize their mother and applicant were in prison until Robert was fifteen or sixteen years old and found a letter, written by their mother, addressed to their father. On his seventeenth birthday, Robert informed the Parole Board that he lied when testifying at his mother's trial and that his mother was innocent. The brothers have maintained that

### D. The Habeas Judge's Findings

After the hearing on this application, the habeas Judge entered, *inter alia*, the following findings of fact:

3. ... [T]he testimony of [Robert] was a critical and substantial part of the evidence upon which the conviction of applicant rested, since said child witness was the actual complaining witness who related at trial allegations of sexual assault by applicant.

4. The Court finds that newly discovered evidence exists which demonstrates the factual innocence of applicant of the offense of aggravated sexual assault of which he stands convicted in this cause.

5. ... [T]his newly discovered evidence, to-wit: the statements made by [Robert] from 1990 through the time of the evidentiary hearing in this cause creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that verdict would be different in a new trial.

\* \* \* \* \*

7. ... [T]he testimony by [Robert] ... is uncontroverted. The Court therefore finds by clear and convincing evidence that [Robert] testified falsely in August, 1984, at the time of the trial of this cause, and it was primarily upon the false testimony of [Robert] that applicant was convicted in this cause.

8. The Court finds that if a jury were to consider the entire record of testimony and evidence before the original jury that rendered the verdict in this cause, and the newly discovered evidence ... no rational trier of fact could find proof of guilt beyond a reasonable doubt.

9. The Court further finds that the newly discovered evidence ... was necessarily unknown to applicant at the time of trial ... the "failure" to discover such evidence was not due to a want of

---

1. Robert's brother testified that their natural father beat them.

diligence on the part of applicant ... and not merely cumulative, corroborative, collateral, or impeaching.... [T]he testimony ... will probably bring about a different result on another trial of this cause.

Based upon these findings, the habeas Judge concluded applicant was entitled to relief and recommended that this Court grant the relief requested by applicant.

## II.

### Due Deference

We are not bound by the "findings, conclusions or recommendations of a trial court in reaching a decision on a postconviction application for writ of habeas corpus." *Ex parte Bates,* 640 S.W.2d 894, 898 (Tex.Cr.App. 1982). However, in habeas hearings, the judge is the fact finder who determines the credibility of the witnesses and we defer to those findings if they are supported by the record. *Ex parte Turner,* 545 S.W.2d 470, 473 (Tex.Cr.App.1977) (If the habeas judge's findings of fact are supported by the record, "they should be accepted by this Court"). *See also, Ex parte Adams,* 768 S.W.2d 281, 288 (Tex.Cr.App.1989). In *Ex parte Moore,* 136 Tex.Crim. 427, 125 S.W.2d 27 (1939), we stated:

... Where the ruling of the trial judge depends upon the existence or non-existence of a certain fact and testimony pro and con is introduced thereon and the evidence is conflicting it becomes the duty of the trial judge to determine the issue, *and unless it appears to this court that his finding was without support in the evidence,* and that he had committed an error in his judgment thereon, *we would not interfere with his findings thereon. Glenn v. State,* 89 Tex.Crim. 13, 229 S.W. 521. [Emphasis added.]

*Id.,* 126 S.W.2d at 28.

The habeas judge in the instant case determined the following: 1) the newly discovered evidence, to-wit: the statements made by Robert from 1990 through the writ hearing, created a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that verdict would be different in a new trial; 2) that the newly discovered evidence is uncontroverted and that Robert testified falsely at applicant's trial and that applicant was convicted primarily upon this false testimony; and, 3) the newly discovered evidence was unknown to applicant at the time of his trial and his failure to discover it was not due to a want of due diligence. These factual determinations are supported by the record and, therefore, should be accepted by this Court, *Turner, supra,* and applicant is entitled to relief.

## III.

### The Burden of Proof

Even if we refused to accept the habeas Judge's findings of fact, applicant is nevertheless entitled to relief. Under *Schlup, supra,* applicant must show "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Ante,* 947 S.W.2d at 209. Clear and convincing evidence is an intermediate standard of proof which falls between the ordinary civil "preponderance of the evidence" standard and our usual "beyond a reasonable doubt" standard in criminal cases. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979). Clear and convincing evidence is defined "as that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Ibid.* It is in this light that we must review all of the evidence to determine if applicant met his burden.

In applicant's original trial the State presented only four witnesses. Robert's teacher testified to finding the sexually explicit note and drawing. A police officer and Robert's stepmother related Robert's outcry statements concerning the alleged sexual assault. And finally, Robert testified he and his brother were ongoing victims of aggravated sexual assault by their mother and applicant.

The newly discovered evidence is the recent testimony of Robert and his brother. Both testified that the alleged aggravated sexual assault *never* occurred and that Robert's trial testimony was perjured and se-

cured through the intimidation of Robert and his brother by their father.

When considering all of this evidence in light of the new evidence, I agree with the majority that no reasonable juror would have convicted applicant.

With these comments, I join the majority opinion.

WHITE, Judge, dissenting.

The majority states they "are convinced by clear and convincing evidence that no rational jury would convict him [applicant] in light of the new evidence." Because I believe the majority incorrectly evaluates applicant's post-conviction claim of innocence, I dissent to their decision to grant relief to applicant.

An applicant's due process right to pursue a freestanding claim of newly discovered evidence of innocence, which meets the threshold standard for a "truly persuasive" demonstration of innocence under the standards set out in *State ex rel. Holmes v. Court of Appeals,* 885 S.W.2d 389 (Tex.Cr.App.1994), in a non-capital felony case at the post-conviction stage necessarily demands an extraordinarily high showing of innocence. First and most important, the criminal trial is the primary event for determining the criminal guilt or innocence of an applicant's innocence. A criminal defendant is given many rights to ensure an innocent person will not be convicted. Many rights and resources have been concentrated at that time to decide guilt or innocence. *See Herrera v. Collins,* 506 U.S. 390, 401–03, 113 S.Ct. 853, 861, 122 L.Ed.2d 203, 217 (1993). A post-conviction habeas applicant has already been accorded the various protections provided by the Constitution which seek to ensure that the innocent will not be convicted. And he has been found guilty beyond a reasonable doubt in this case, by a jury. Thus, the habeas applicant is a legally guilty person, not an innocent one. *See Herrera,* 506 U.S. at 419–20, 113 S.Ct. at 870, 122 L.Ed.2d at 229.(O'Connor, J. concurring). Second, a state has a strong interest in punishing the guilty and in the finality of its judgments. Therefore, it is only the truly extraordinary case that should merit review on a post-conviction claim of innocence.

Based on these considerations, an applicant seeking relief based on a claim of innocence should have to "demonstrate that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different." *State ex rel. Holmes,* 885 S.W.2d at 398. If this showing is made, the habeas court must give the applicant a forum and an opportunity to present evidence. *Ibid.* Because the district court held a hearing on applicant's claim of innocence, it needs only to be determined what burden of proof applicant must satisfy to obtain habeas relief.

In the instant case, the majority revisits the discussion of *Herrera* that took place in *Holmes.* In doing so, the majority chooses to resuscitate the burden of proof proposed by Justice Blackmun in his dissent in *Herrera,* which was rejected by a majority of the Court in *Herrera* and by a majority of the members of this Court in *Holmes,* and breathe new life into it here. In the instant cause, the majority elevates itself to the position of being the thirteenth juror, overseeing applicant's post-conviction claim of innocence to determine whether the newly discovered evidence convinces them of an applicant's innocence. (The majority ignores both the precedent of this Court and the principle of stare decisis to achieve the result they desired.)

This Court should adhere to the standard set down in *State ex rel. Holmes,* wherein this Court discussed the need for a very high burden of proof for a claim of actual innocence, relying on *Herrera* that such a claim should not be easily set aside. This Court concluded that an individual "must show that based on the newly discovered evidence and the entire record before the jury that convicted him, no rational trier-of-fact could find proof of guilt beyond a reasonable doubt" for the individual to obtain relief. *Id* at 399. It is only the rare case which should be able to meet this high burden so as to accord proper

LAW

STILES
STILES



respect to our system of justice through which a habeas applicant has already traveled and been granted numerous rights designed to protect the innocent from conviction. We should apply the same burden of proof to non-capital cases as we established for capital cases because the considerations underlying confidence in the criminal trial and the respect due to finality of judgments must also apply in the non-capital setting. Therefore, to obtain post-conviction relief in a non-capital felony an individual should be required to show that based on the newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof beyond a reasonable doubt. This should have been the standard set for applicant to meet in the instant case. Instead, the majority opts for a lower standard.

The majority then reviews the facts of the instant case in order to determine whether there is "clear and convincing evidence" in the record to "unquestionably establish" for them that applicant is innocent.[1] In doing so, the majority overlooks evidence that was presented at trial. In its opinion, the majority states there was a "complete lack of any other inculpatory evidence in the case, direct or circumstantial." The majority states, without citation of authority, that "we think" another jury hearing applicant's new evidence would acquit applicant. Essentially, the majority thinks applicant is innocent, and has chosen to substitute that wholly subjective judgment for the judgment of the jury who convicted applicant. Instead of precedent, authority, and stare decisis, the majority gives us an unsupported judgment call that they think applicant is innocent.

There are two problems with the method by which the majority reaches this judgment. First, the majority's errs in concluding there was no other inculpatory evidence at trial.

1. The majority relies extensively on *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), in setting down the threshold standard to review applicant's claim of newly discovered evidence of his innocence. However, *Schlup* is distinguishable from the instant cause. In the instant cause, applicant contends that he is innocent because the key witness against him at trial, his son Robert, recanted his trial testimony at the writ hearing. Applicant's other son Richard also testified at the writ hearing. Applicant does not claim constitutional violation aside from his due process rights which have been infringed upon because he has been incarcerated and deprived of his liberty for a crime which he claims that he did not commit. This is a claim of "bare innocence." Michael J. Muskat, *Substantive Justice and State Interests in the Aftermath of Herrera v. Collins: Finding an Adequate Process for the Resolution of Bare Innocence Claims Through State Postconviction Remedies*, 75 TEX.L.REV. 131, at 133 (1996).

*Schlup*, on the other hand, involved a claim of "actual innocence," wherein a showing of innocence is used to bypass a procedural bar preventing consideration of a constitutional claim. Muskat, 75 TEX.L.REV. N.8, at 133. In *Schlup*, his claim of innocence, ..., is procedural, rather than substantive. His constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel, ... and the withholding of evidence by the prosecution, ... denied him the full panoply of protections offered to criminal defendants by the Constitution." *Schlup*, 513 U.S. at 314, 115 S.Ct. at 860, 130 L.Ed.2d at 827. Schlup offered his claim of innocence only to obtain a post-conviction hearing of the merits of his constitutional claims by bringing him within the "narrow class of cases" which implicate a fundamental miscarriage of justice. *Schlup*, 513 U.S. at 313-16, 115 S.Ct. at 860-61, 130 L.Ed.2d at 827-828.

Where an applicant pursuing a claim of "bare innocence" attempts to present newly discovered evidence that he alleges will prove his innocence, but does not attach the evidence to a constitutional violation that occurred at trial, the applicant is seeking "only a review of the new evidence, with the hope that the evidence will warrant post-conviction relief in the form of a vacation of his conviction." Muskat, 75 TEX L.REV., at 133. This is the position advanced by applicant in the instant cause. The lack of a constitutional violation at trial is what distinguishes applicant's case from the applicant in *Schlup*.

The standards of review for evaluation these two distinct claims of innocence are not the same in the federal system. When a convicted person claims that he or she is "actually innocent," as approximates that used by most states when hearing a motion for new trial based on newly discovered evidence. Muskat, 75 TEX.L.REV., at 177-178. When a convicted person pursues his or her claim of "bare innocence," as applicant did in the instant cause, the standard set by the Court in *Herrera* to hear such claims is higher. Muskat, 75 TEX.L.REV., at 178-179.

The majority's decision to lower the standard set down by this Court in *Holmes* will muddle, if not completely obliterate, the substantive distinction between a claim of "actual innocence," and a claim of "actual innocence."

At trial, the State introduced an inappropriate note and drawing of a sexual nature done by Robert at school. Robert's stepmother testified that Robert told her that the sexual information he relied on to write and draw the note came from applicant and his natural mother. The police officer who spoke with Robert about the sexual abuse which he and his brother suffered at the hands of applicant and their natural mother also testified at trial. Robert's schoolteacher, in addition to his stepmother and the interviewing police officer, also testified at trial. This is definitely more than a complete lack of circumstantial or direct inculpatory evidence.

Second, the majority's decision to depart from the standard set by the Court in *Herrera* and adopted by this Court in *Holmes* for evaluating a claim of innocence casts doubt upon their decision. Under the *Holmes* standard this Court should determine whether based on the newly discovered evidence and the trial evidence, any rational trier of fact could find guilt beyond a reasonable doubt. See and compare *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Cr.App.1991); and *Villalon v. State*, 791 S.W.2d 130 (Tex.Cr. App.1990). This is a legal determination.

Applicant should have been required to show that based on the newly discovered evidence offered at his writ hearing, Robert's recantation of his trial testimony and Richard's testimony at the writ hearing that the offenses did not occur, and based on the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt beyond a reasonable doubt.

Unlike the majority's conclusion, the evidence at trial was sufficient to support applicant's conviction and consisted primarily of Robert's testimony. The newly discovered evidence simply conflicts with that evidence. Since we, as the reviewing court, must presume a hypothetical jury would resolve all conflicts in favor of its verdict, a rational trier of fact could find proof of applicant's guilt beyond a reasonable doubt at trial. That another factfinder, the habeas court or the majority in its position as thirteenth juror, believes testimony from Robert almost eleven years after the date of the trial and thinks applicant could be innocent, does not invalidate the original jury's verdict.

In *Holmes*, this Court adopted a burden of proof based on the sufficiency review of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Therefore, like an appellate court reviewing sufficiency of the evidence, this Court should have reviewed the newly discovered evidence and whether based on all of that evidence no rational trier of fact could find proof beyond a reasonable doubt. In *Jackson v. Virginia* the Supreme Court emphasized that appellate review of the sufficiency of the evidence does not mean the appellate court should ask itself whether it believes the evidence established guilt beyond a reasonable doubt. Unfortunately, today, the majority chooses to cast aside precedent and stare decisis, so that it may undertake the type of review decried in *Jackson v. Virginia*.

Because a rational trier of fact could choose to believe the testimony presented at trial rather than the testimony presented at the writ hearing, I would have concluded applicant has not met his burden to be entitled to relief on his claim of innocence. Because the majority reaches an opposite conclusion, I dissent.

McCORMICK, P.J., and KELLER, J., join this dissent.

WOMACK, Justice, dissenting on State's Motion for Rehearing.

In this case a bare majority extended *Holmes v. Third District Court of Appeals*, 885 S.W.2d 389 (Tex.Cr.App.1994), to non-capital cases, lowered the burden of proof, and apparently allowed a petitioner to get relief from his sentence if he can get a witness to recant. None of this is required by the precedents cited. These are very bad policies as well.

To begin with, *Holmes* was decided on very shaky ground. In saying that habeas corpus is available for a claim of newly discovered evidence of innocence in a capital case, *Holmes* purported to follow *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). The holdings of that



case were: (1) Federal habeas corpus is not available for a claim of newly discovered evidence of innocence in the absence of a violation of constitutionally-required procedures. To require a new trial simply because a jury might acquit in light of the new evidence would not clearly produce a more reliable result, since the passage of time only diminishes the reliability of criminal adjudications. (2) Texas's 30-day limit to move for new trial on newly discovered evidence does not deny due process. (3) Executive clemency is the traditional "fail safe" remedy for late evidence of innocence. (4) *Even if it were assumed for the sake of argument that a truly persuasive demonstration of actual innocence would render an execution unconstitutional* so that federal habeas corpus would lie, Herrera's evidence fell far short of showing the extraordinarily high threshold showing that would be required. (Herrera's evidence was two witnesses who said that Herrera's brother, now dead, had admitted committing the crime.)

This is mighty thin sand on which to erect the holding of *Holmes* that due process (not the Cruel and Unusual Punishment Clause) would be violated by the execution of an innocent defendant, and that state habeas corpus will lie to permit a defendant to present newly discovered evidence of innocence. And it is no support at all for the holdings in this case that due process is violated by the post-conviction habeas corpus is available to correct errors of fact, that the defendant must prove his claim by no more than clear and convincing evidence, and that the evidence of a recanting witness might be sufficient.[1]

If rehearing is denied, a convicted defendant in every criminal case (if it a due process problem, there is no reason to limit it to felonies or to sentences of confinement), will now be allowed and encouraged to pursue the witnesses and get them to recant. If he does so, he can religitate his case forever. And all this is supposed to be based on *Herrera*, where the Court said that habeas corpus was not available because, "Due process does

1. What could be weaker than the evidence of a recanting witness, whose testimony is always,

"The last time I was on the witness stand I didn't tell the truth"?

not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.' *Patterson v. New York,* 432 U.S. 197, 208, 97 S.Ct. 2319, 2326, 53 L.Ed.2d 281 (1977). To conclude otherwise would all but paralyze our system for enforcement of the criminal law."

I vote to grant rehearing to reconsider the revolutionary and unwarranted procedure that this case has created.

McCORMICK, P.J., and KELLER and HOLLAND, JJ., join this dissent.



Ex parte James Carl Lee DAVIS.

No. 72247.

Court of Criminal Appeals of Texas,

En Banc.

Dec. 18, 1996.

Rehearing Denied March 19, 1997.

Petitioner sought habeas corpus relief from conviction and death sentence, challenging Code of Criminal Procedure provision which imposed restrictions on subsequent applications for habeas corpus. The Court of Criminal Appeals, Overstreet, J., held that: (1) statute did not violate separation of powers clause; (2) rights to habeas corpus relief were not unconstitutionally suspended; (3) statute was not ex post facto law; (4) statute was not unconstitutional retroactive law; (5) statute did not violate equal protection; (6) statute did not violate due process; (7) petitioner received effective assistance of counsel; and (8) statute did not violate open courts provision.

Application dismissed; stay of execution vacated.

McCORMICK, P.J., filed concurring opinion in which White, Meyers and Keller, JJ., joined.

Clinton, J., filed dissenting opinion in which Maloney, J., joined.

Baird, J., filed concurring opinion in which Overstreet, J., joined.

Mansfield, J., filed concurring opinion.

1. Constitutional Law ⚖55

Statute which imposed restrictions on subsequent applications for habeas corpus did not operate as ex post facto law; it did not punish as crime act previously committed which was innocent when done, change punishment and inflict greater punishment than law attached to criminal offense when committed, or deprive person charged with crime of any defense available when offense was committed. Vernon's Ann.Texas Const. Art. 1, § 16; Vernon's Ann.Texas C.C.P. art. 11.071.

2. Habeas Corpus ⚖205

Legislature may enact laws effecting implementation of right to writ of habeas corpus. Vernon's Ann.Texas Const. Art. 1, § 12; Art. 2, § 1.

3. Constitutional Law ⚖50

Separation of powers provision may be violated in two ways: when one branch of government assumes, or is delegated, to whatever degree, a power that is more properly attached to another branch; or when one branch unduly interferes with another branch so that other branch cannot effectively exercise its constitutionally assigned powers. Vernon's Ann.Texas Const. Art. 2, § 1.

4. Habeas Corpus ⚖912

Statute which imposed restrictions on subsequent applications for habeas corpus did not unconstitutionally suspend certain fundamental rights to habeas corpus relief to a certain class of litigants without constitutional amendment; rather, provision simply provided methodology for rendering and effecting implementation of right to writ of habeas corpus and did not prevent Court of Criminal Appeals from exercising its constitutional powers over writ. Vernon's Ann.Texas Const. Art. 1, § 12; Vernon's Ann.Texas C.C.P. art. 11.071.

5. Constitutional Law ⚖199
Habeas Corpus ⚖205

Statute which imposed restrictions on subsequent applications for habeas corpus did not violate separation of powers clause; statute simply provided methodology for rendering writ of habeas corpus and did not prevent Court of Criminal Appeals from exercising its constitutional powers over writ. Vernon's Ann.Texas Const. Art. 2, § 1; Vernon's Ann.Texas C.C.P. art. 11.071.

6. Constitutional Law ⚖197

Under Texas or United States constitutional analysis, "ex post facto law"; punishes as crime an act previously committed which was innocent when done; changes punishment and inflicts greater punishment than law attached to criminal offense when committed; or deprives person charged with crime of any defense available at time act was committed. U.S.C.A. Const. Art. 1, § 9, cl. 3; Vernon's Ann.Texas Const. Art. 1, § 16; Vernon's Ann.Texas C.C.P. art. 11.071.
See publication Words and Phrases for other judicial constructions and definitions.

7. Constitutional Law ⚖191
Habeas Corpus ⚖205

Code of Criminal Procedure provision which provided that court may not consider subsequent applications for writ of habeas corpus unless application contains specific facts to establish certain things was not unconstitutional retroactive law, as provision was procedural. Vernon's Ann.Texas Const. Art. 1, § 16; Vernon's Ann.Texas C.C.P. art. 11.071.

8. Constitutional Law ⚖250.5
Habeas Corpus ⚖205

Code of Criminal Procedure provisions which provided that court may not consider subsequent applications for writ of habeas corpus unless application contains sufficient specific facts to establish certain things did not violate equal protection clauses, despite argument that one provision was being ap-



EX PARTE DAMON JEROME RICHARDSON, Applicant

COURT OF CRIMINAL APPEALS OF TEXAS

70 S.W.3d 866; 2002 Tex. Crim. App. LEXIS 45

NO. 74,221

March 13, 2002, Decided

**Editorial Information: Prior History**

ON APPLICATION FOR A WRIT OF HABEAS CORPUS FROM LUBBOCK COUNTY.

**Disposition:**

Habeas corpus granted; conviction set aside; applicant remanded to Lubbock County sheriff.

**Counsel**

Long, Austin.

ATTORNEYS FOR APPELLANT: David L. Botsford, Austin, Walter C.

Dallas.

ATTORNEYS FOR STATE: Michael West, Special Prosecutor,

Johnson, Hervey and Holcomb, JJ. Keasler, J., concurred in the disposition.

**Judges:** Cochran, J., delivered the opinion of the Court, joined by Keller, P.J., Meyers, Price, Womack,

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant was found guilty as a participant in the capital murder of three individuals during a single criminal transaction and sentenced to death, by the 72nd District Court of Lubbock County (Texas). After his conviction and sentence were affirmed by the Court of Criminal Appeals of Texas, he applied for a writ of habeas corpus. Defendant satisfied his burden of proving, by a preponderance of evidence, facts entitling him to habeas relief; credibility of State's only eyewitness was crucial trial issue and State had duty to disclose material evidence impeaching her.

**OVERVIEW:** Defendant and three others were indicted for the capital murders. The co-defendants were tried separately; defendant stood trial first. The State's star witness, an eyewitness, gave testimony clearly crucial to the capital murder case against defendant. It placed him at the murder scene at the time of the killings and assigned primary responsibility for the murders to him. Her story unraveled entirely in subsequent trials. Defendant complained the State failed to disclose the existence of a diary kept by a former police officer, which would have provided the defense team with powerful impeachment evidence against that witness, and, with her credibility thus compromised, there was a reasonable probability the jury would not have convicted him. The habeas judge found the diary was not disclosed to the defense team, and the instant court found the record supported his findings. Thus, defendant had met the first of the three required tests for habeas relief. The instant court agreed with the habeas judge who concluded as a matter of law that the evidence would, in all likelihood, create the probability sufficient to undermine the confidence in the outcome of the proceeding.

**OUTCOME:** Habeas relief was granted and defendant's conviction was set aside; defendant was

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

1 txcases

---

remanded to the custody of the sheriff to answer the indictment.

**LexisNexis Headnotes**

*Criminal Law & Procedure > Accessories > Aiding & Abetting*

See Tex. Penal Code § 7.02(a)(2).

*Criminal Law & Procedure > Habeas Corpus > Procedure > Filing of Petition > General Overview*
*Criminal Law & Procedure > Discovery & Inspection > Brady Materials*
*Criminal Law & Procedure > Discovery & Inspection > Suppression of Evidence*
*Criminal Law & Procedure > Habeas Corpus > Cognizable Issues > Due Process*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*

To prevail upon a post-conviction writ of habeas corpus, applicant bears the burden of proving, by a preponderance of the evidence, the facts that would entitle him to relief. Where the applicant claims that the prosecution suppressed exculpatory evidence and thereby violated his right to due process, applicant must satisfy a three-pronged test. Applicant must first show that the State failed to disclose evidence, regardless of the prosecution's good or bad faith. He must then show that the withheld evidence is favorable to applicant. Finally, the applicant must show that the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. As in any habeas proceeding, the applicant must prove the constitutional violation and his entitlement to habeas relief by a preponderance of the evidence.

*Criminal Law & Procedure > Discovery & Inspection > Brady Materials*
*Criminal Law & Procedure > Pretrial Motions > Suppression of Evidence*
*Criminal Law & Procedure > Trials > Examination of Witnesses > Admission of Codefendant Statements*

The prosecution has affirmative duty to disclose material, exculpatory evidence to an accused; the prosecution's suppression of such material violates the Due Process Clause of the Fourteenth Amendment.

*Criminal Law & Procedure > Discovery & Inspection > Brady Materials*
*Criminal Law & Procedure > Habeas Corpus > Procedure > Filing of Petition > General Overview*
*Criminal Law & Procedure > Verdicts > General Overview*

A habeas applicant demonstrates that he is entitled to relief for a Brady violation by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Criminal Law & Procedure > Discovery & Inspection > Brady Materials*

Under Bagley, exculpatory evidence includes impeachment evidence.

**Opinion by:** Cochran

**Opinion**

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

1 txcases

Opinion

{70 S.W.3d 866} In his application for a writ of habeas corpus, applicant alleges twenty points of {70 S.W.3d 867} constitutional error in his conviction for capital murder under Texas Penal Code, Sections 19.02(a)(1) and 19.03(a)(6)(A). This Court ordered points 13, 14, 15, and 17 filed and set for submission. 1 Because we agree that the credibility of the State's only eyewitness, Anita Hanson, was a crucial issue in applicant's trial, we conclude that the State had an affirmative constitutional duty under *Brady v. Maryland* 2 to disclose material evidence that impeached her testimony. We further find that applicant has satisfied his burden of proving, by a preponderance of the evidence, the facts that entitle him to habeas relief. Therefore, we grant habeas relief.

I.

In our published opinion on applicant's direct appeal from his capital murder conviction, 3 this Court described the key evidence at trial. We briefly recite that evidence here.

A grand jury indicted applicant and three co-defendants (Michael Stearnes, Lambert Wilson, and Rodney Childress) for the September 10, 1987, capital murders of Napoleon Ellison, Quinnie Smith, and Vivian Webb. 4 Mr. Ellison allegedly worked for applicant, dealing cocaine that applicant smuggled into Lubbock; 5 Ms. Smith and Ms. Webb were members of Ellison's household. The co-defendants were tried separately; applicant stood trial first.

Anita Hanson, who claimed longtime association with applicant, was the State's star witness. Ms. Hanson provided crucial eyewitness testimony regarding applicant's {70 S.W.3d 868} participation in the murders. She testified to attending a September 7th party with applicant and Lambert Wilson at a mutual friend's home in Lubbock. While there, she overheard applicant tell Mr. Wilson that he planned to kill Webb and Ellison, 6 and that Wilson agreed to participate in the killings if applicant paid him to do so.

Ms. Hanson testified that Wilson and Michael Stearnes picked her up in a car at a Lubbock park around 12:30 a.m. on September 10, 1987. They drove to Ellison's residence. Wilson, the driver, parked the car about two blocks away. Wilson and Mr. Stearnes left Hanson in the car and walked quickly toward the residence. Wilson carried an Uzi machine gun, and Stearnes carried a shotgun. Hanson testified that she believed Wilson and Stearnes intended only to frighten Ellison.

Hanson waited in the car for approximately twenty minutes before deciding to walk to Ellison's residence herself. She heard "a loud boom" when she reached Ellison's driveway, and she ran inside the house. There she saw applicant, Wilson, Stearnes, Mr. Childress, and Napoleon Ellison. Ellison was slumped in a chair with his head down, and there was blood on him. Hanson testified that applicant carried a pistol, Childress had a shotgun, and Wilson still carried an Uzi. Applicant and Wilson both wore rubber gloves. Mr. Childress told Hanson that applicant had forced him to kill Webb. Ellison then raised his head and asked Hanson to help him. Hanson asked applicant, who appeared to be in charge, whether she could telephone a doctor, but he said no. Applicant then took the Uzi from Wilson, handed it to Hanson, and ordered her to shoot Ellison. Hanson testified that applicant threatened to kill her if she did not. Hanson complied, firing three shots into Ellison. Applicant then instructed Wilson to remove some "drugs" from a cabinet beneath the kitchen sink, and Wilson did so. Shortly thereafter, Hanson left the residence with Wilson and Stearnes. 7

{70 S.W.3d 869} Webb, Smith, and Ellison were found dead in the Ellison residence on the afternoon of September 10. A forensic pathologist testified that all of the victims died of multiple gunshot wounds. A search of the residence revealed two plastic bags of marijuana, two shotgun shells, several nine-millimeter shell casings, and some photographs of applicant. A Department of Public Safety firearms examiner testified that all of the nine-millimeter shell casing came from the same weapon and that the weapon could have been an Uzi machine gun.

An anonymous telephone call brought Hanson's possible knowledge of the murders to the attention of the District Attorney's Office. Police detectives questioned Hanson, and on September 15, 1987 she gave her first of six sworn statements regarding the murders. The District Attorney's Office placed Hanson under "protective custody" as a material witness beginning shortly after her first statement. By October 15, 1987 Hanson had identified herself as a participant, having sworn that she fired three bullets from an Uzi machine gun into Napoleon Ellison. Nonetheless, Hanson remained unindicted and in protective custody in various locations around Lubbock for approximately a year, until she testified at applicant's trial in late September 1988. A security detail composed of two Lubbock police officers per shift 8 watched over Hanson twenty-four hours a day. After she testified at applicant's trial, Hanson received a $ 4,000 relocation allowance from the District Attorney's Office.

Applicant stood trial in the 72nd District Court of Lubbock County in late September and early October of 1988. 9 A jury found him guilty as a party 10 to the capital murder of three individuals during a single criminal transaction and answered all punishment questions affirmatively. The trial judge sentenced applicant to death. Direct appeal to this Court was automatic under Article 37.071(2)(h). 11 We affirmed the trial court's judgement and sentence. 12

Applicant's co-defendants fared significantly better. Michael Stearnes was acquitted 13 in 1990 after a bench trial in which his defense counsel fatally impeached Anita Hanson's credibility, confronting her with her prior inconsistent sworn statements and eliciting her admission to having lied under oath. During Lambert Wilson's subsequent jury trial, Ms. Hanson admitted that she had not {70 S.W.3d 870} always told the truth while testifying in Michael Stearnes' trial. The jury in Mr. Wilson's trial deliberated for merely two hours before returning a not guilty verdict. 14 Rodney Childress never stood trial for the murders. On the State's motion, the trial court dismissed the indictment against Mr. Childress, finding that the evidence was insufficient to sustain a conviction, even though Hanson had named Childress as Vivian Webb's actual killer. 15

Applicant filed his present application for a writ of habeas corpus. After a fifteen- day habeas hearing, the trial court entered extensive factual findings that are supported by the habeas record transmitted to this Court.

II.

To prevail upon a post-conviction writ of habeas corpus, applicant bears the burden of proving, by a preponderance of the evidence, the facts that would entitle him to relief. 16 Where, as here, the applicant claims that the prosecution suppressed exculpatory evidence and thereby violated his right to due process, 17 applicant must satisfy a three-pronged test. 18 Applicant must first show that the State 19 failed to disclose evidence, regardless of the prosecution's good or bad faith. 20 He must then show that the withheld evidence is favorable to applicant; 21 Finally the applicant must show that the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. 22 As in any habeas proceeding, the applicant must prove the constitutional violation and his entitlement to habeas relief by a preponderance of the evidence.

{70 S.W.3d 871} III.

Applicant complains that the District Attorney failed to disclose the existence of a diary kept by Tonya Goldston, formerly a police officer with the Lubbock Police Department, which would have provided

lxcases

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the defense team with powerful impeachment evidence against the State's only eyewitness, Anita Hanson. Applicant further contends that, with the credibility of the State's star witness thus compromised, there is a reasonable probability that the jury would not have convicted applicant.

Officer Goldston, who did not testify at applicant's capital murder trial, served on Hanson's security detail and maintained a diary or log of the time she spent guarding Hanson. At the habeas hearing, Officer Goldston identified a copy of her original diary and testified that in late April or early May of 1988, she gave the diary to then-Assistant Chief of Police, Michael Huffman, at Huffman's request. Assistant Chief Huffman 23 identified a memorandum regarding Goldston's diary that he prepared and sent to the District Attorney, along with the diary, on May 10, 1988. Although applicant's trial did not begin until September 6, 1988, some three months later, members of the prosecution team testified at the habeas hearing that they had not seen the diary nor were they aware that it existed. 24 The diary was found in applicant's file at the District Attorney's Office, however, at some point after applicant's conviction. Based on this and other testimony, the habeas judge found that Officer Goldston's diary was not disclosed to applicant's defense team. Although we are not bound to follow the habeas judge's findings of fact, 25 we find that the record supports his findings. Accordingly, we find that applicant has met the first of the three required tests for habeas relief.

Applicant must also show that the the diary constituted exculpatory evidence. 26 After identifying her diary and affirming the truth of its contents, Officer Goldston testified that the State's star witness was not a truthful person and that she, Goldston, kept the log to protect herself from any false accusations or complaints Hanson might make about her, as Hanson had made such complaints about other officers who guarded her. 27 Goldston's diary identified fellow officers on the security detail {70 S.W.3d 872} and described her interactions with Hanson, as well as information other officers conveyed to her. Applicant's habeas counsel called five of the officers that Goldston's diary had identified as members of the protective detail and elicited each officer's opinion regarding Hanson's truthfulness.

Without exception, each officer testified that Hanson was not a truthful person. 28

Under Begley, exculpatory evidence includes impeachment evidence. 29 The live testimony of six law enforcement officers who had extensive personal contact with Hanson and were therefore in a position to form an opinion regarding her credibility was extremely powerful impeachment evidence. We find that the diary and the testimony it led to were favorable to applicant.

Lastly, applicant must show that the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. Applicant's habeas hearing spanned fifteen full days and included testimony from forty-five witnesses. Among his many factual findings regarding applicant's claims, the habeas trial judge 30 determined that "there [was] no question but that by the time of applicant's trial Anita Hanson's credibility was a major issue in the case." 31 The habeas trial judge heard extensive testimony regarding Anita Hanson's credibility (or lack thereof), the State's knowledge of her credibility problems, the circumstances of her year secreted away in protective custody, and whether Hanson had agreed to testify against applicant in return for the District Attorney's explicit or implicit promise not to prosecute her for killing Napoleon Ellis.

Anita Hanson's eyewitness testimony clearly was crucial to the State's capital murder case against applicant. Her account placed applicant at the murder scene at the time of the killings and assigned primary responsibility for the murders to applicant, whom Hanson claimed was in charge and ordered Hanson to shoot Ellison. She was the only eyewitness who testified to the actual killings and applicant's participation. The State's other witnesses established only that (i) appellant possessed a motive to commit the murders and intended to act on that motive, and (ii) {70 S.W.3d 873} two witnesses had observed him firing a machine gun on some prior date. 32 It was upon her testimony

that the jury convicted applicant of capital murder and sentenced him to death. Applicant's co-defendants, however, who were tried separately, were either acquitted or their indictments were dismissed as, over time, Anita Hanson's credibility was fatally impeached by her ever-increasing number of self-admitted perjurious statements. Her story unraveled entirely in subsequent trials. We find that applicant has demonstrated a reasonable probability that, had the Goldston diary been timely disclosed and the six law enforcement officers testified, Anita Hanson's credibility would have not only been impeached, but severely undermined. 33 Because her testimony was critical to the State's case, we agree with the habeas judge who concluded "I find as a matter of law that the evidence would, in all likelihood, create the probability sufficient to undermine the confidence in the outcome of the proceeding."

Accordingly, we grant relief on applicant's fourteenth constitutional claim and set aside the conviction. Applicant is remanded to the custody of the Lubbock County Sheriff to answer the indictment.

Cochran, J.

Delivered: March 13, 2002

## Footnotes

1

Applicant makes the following claims for relief:

1

Applicant was denied his rights to a fair trial, to due process, and to due course of law, as such rights are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by the State's intentional elicitation of the perjured testimony of Anita Hanson, without whose testimony there would have been legally insufficient evidence.

Applicant was denied his rights to a fair trial, to due process, and to due course of law as such are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by the State's suppression of material, exculpatory evidence: the police diary of Officer Tanya Goldston.

Applicant was denied his rights to a fair trial, to due process, and to due course of law as such are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by the State's suppression of material, exculpatory evidence: the sworn statements of Gary Max Self and Larry Donall Jones.

Applicant was denied his rights to a fair trial, to due process, and to due course of law as such are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by the State's suppression of material, impeachment evidence: the "First Amended Information" against Charles Johnson for injury to a Child.

2

373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

3

Richardson v. State, 879 S.W.2d 874 (Tex. Crim. App. 1993).

4

At the time of the offense, Texas Penal Code, Section 19.02(a)(1) provided that "[a] person commits

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

[murder] if he . . . intentionally or knowingly causes the death of an individual." Section 19.03(a)(6)(A) provided that "[a] person commits [capital murder] if he commits murder as defined under Section 19.02(a)(1) of this code and . . . the person murders more than one person . . . during the same criminal transaction."

5 Applicant's co-defendants allegedly had similar drug ties to Mr. Ellison and applicant.

6 Other associates of applicant provided applicant's alleged motive. Vincent McNeal testified that, sometime before September 8th, applicant told him that Webb and Ellison were "ripping him off" and that, consequently, "he had something for them." Mr. McNeal's testimony also circumstantially linked applicant to one of the alleged murder weapons, an Uzi machine gun. McNeal testified that, on or about September 8th, he saw applicant fire a machine gun on a dirt road in Lubbock County. At applicant's habeas hearing, however, McNeal recanted his trial testimony. McNeal testified that he never heard applicant state that he was sick and tired of the victims ripping him off, and he and the applicant never fired guns together. McNeal also stated that, prior to trial, he told "Buster" Tucker, an investigator for the District Attorney's office, that he had lied to police. Mr. Tucker denied that McNeal had ever said this and asserted that he would have taken McNeal to a prosecutor immediately if McNeal had.

7 Another associate, Rodney Kennedy, also testified to seeing applicant fire an Uzi machine gun, behind the Seven Acres Lodge in Lubbock on or about September 3, 1987. Applicant's Uzi had a silencer attached to it.

8 Charles Johnson, Ellison's neighbor, testified that, around 12:30 a.m. on September 10, he (i.e., Johnson) went out to his car to smoke a cigarette. While sitting in his car, he saw an automobile pull into Ellison's driveway. Moments later, a van parked on the street in front of Ellison's residence. Applicant got out of the car, and Hanson, Wilson, and two other males got out of the van. Someone then knocked on the door of Ellison's residence. Ellison opened the door and let some or all of the males inside. A few minutes later, Mr. Johnson heard what sounded like a shotgun blast coming from the residence. Five other neighbors of Ellison testified that around 4:00 a.m. on September 10, they were awakened by several gunshots. In our opinion on direct appeal, we noted the discrepancy between Hanson's and Johnson's account of Hanson's arrival. Richardson, 879 S.W.2d at 879 n.6. We now note that the habeas judge found Johnson not to be a credible witness.

9 Perhaps a dozen officers were assigned to Hanson's security detail for varying lengths of time, including Tonya Goldston, Brian Jenkins, Debra Pinkston, Ruth Ann Surface, Rosanna Langston, and their supervising officer, Lieutenant Richard Foster.

10 Applicant's trial was held in Taylor County on a motion for change of venue.

11 Texas Penal Code Section 7.02(a)(2) provides that "[a] person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist in the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

All references to articles are to those in the Texas Code of Criminal Procedure.

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

12 879 S.W.2d at 877.

13 State v. Stearnes, No. 87-406,927 (99th Dist. Ct., Lubbock County, Tex., March 24, 1990). In fact, the trial court found that, on the basis of the evidence, Mr. Stearnes was not even present at the murder scene.

14 State v. Wilson, No. 87-406,923 (237th Dist. Ct., Lubbock County, Tex., November 2, 1990).

15 State v. Childress, No. 87-406,924 (140th Dist. Ct., Lubbock County, Tex., November 6, 1990).

16 Ex parte Morrow, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997); Ex parte Thomas, 906 S.W.2d 22, 24 (Tex. Crim. App. 1995); Ex parte Kimes, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993); Ex parte Adams, 768 S.W.2d 281, 287-88 (Tex. Crim. App. 1993); Ex parte Maldonado, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

17 Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963) (prosecution has affirmative duty to disclose material, exculpatory evidence to an accused; prosecution's suppression of co-defendant's confession violated Due Process Clause of the Fourteenth Amendment); Ex parte Kimes, 872 S.W.2d at 702.

18 Kimes, 872 S.W.2d at 702-03 (citing United States v. Bagley, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985)).

19 The "State" includes not only the particular prosecutor, but members of his office and members of law enforcement connected to the investigation and prosecution of a particular case. Kyles v. Whitley, 514 U.S. 419, 437, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995); Ex parte Mitchell, 977 S.W.2d 575, 578 (Tex. Crim. App. 1997).

20 Kimes, 872 S.W.2d at 702-03.

21 Id.

22 Id. at 702-03. A habeas applicant demonstrates that he is entitled to relief for a Brady violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. at 435; Ex parte Adams, 768 S.W.2d at 290. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.

23 Chief Huffman, like Officer Goldston, did not testify at applicant's capital murder trial.

24

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Several prosecutors testified at the habeas hearing that they would have disclosed the diary as possible *Brady* material, had they known of the diary's existence.

25 *Ex parte Morrow*, 952 S.W.2d at 534; *Ex parte Adams*, 768 S.W.2d at 288.

26 *Kimes*, 872 S.W.2d at 702-03; *Ex parte Maldonado*, 688 S.W.2d at 116.

27 Officer Goldston's diary related one such incident, in which Hanson falsely accused Officer Goldston and fellow officer, Brian Jenkins, of sleeping on duty.

Anita told the D.A.'s office that she had sneaked out while [Officer Jenkins] and I were sleeping on duty. She could not remember what day she did this. She said she left through her glass sliding door, climbed over the balcony [rail], dropped down onto the fence and then climbed down to the ground. She said that she walked around in front of this apartment and returned to her room in the same way she got down.

One would have to be quite athletic, or very tall, to accomplish this. Anita is neither. I feel that she only stepped out onto the balcony. I tried this action myself (in front of [another officer] and accomplished it without making a sound. [Officer Jenkins] and I feel that she went outside the night we heard the click sound - Oct. 29th.

Officer Jenkins also testified at the habeas hearing and corroborated Officer Goldston's account.

Hanson also falsely accused Officer Goldston of telling her, Hanson, that there was a contract on Hanson's life and that Officer Goldston claimed to have "special snitches who told [her] things."

28 Lieutenant Foster: "... Certainly, her truthfulness was questionable." Officer Goldston:"I do not believe her to be truthful." Officer Jenkins: "I would have to say that [Hanson's reputation for truthfulness] was bad." Officer Surface: I never trusted her as a truthful person. Officer Pinkston:"I don't believe she was [truthful]." When asked whether her opinion "was also consistent with what [Pinkston] heard from other officers about [Hanson's] reputation for truthfulness," namely, Hanson's "bad reputation for truth and veracity," Pinkston replied, "Yes, sir."

29 Each of the officers testified that he would have complied with a subpoena to testify at applicant's capital murder trial.

30 *Kimes*, 872 S.W.2d at 702.

31 The Hon. Judge David McCoy presided over applicant's habeas hearing; the Hon. Judge Thomas Blackwell presided at applicant's trial.

32 The parties did not dispute this point.

33 Refer to note 7, *supra*, regarding Charles Johnson's testimony. Applicant's trial counsel *did* impeach Ms. Hanson's testimony in other ways, but nothing that

applicant's attorney presented at trial could compare with a parade of six law enforcement officers testifying that, in their opinion, Ms. Hanson was not a credible witness and not worthy of belief under oath. *See* TEX. R. EVID. 405.

STILES LAW LIBRARY 11/25/2015

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.